ANDREW WILSON v. STATE.

No. 2313. Decided February 26, 1913.

**1.—Assault to Murder—Evidence—Conspiracy—Co-Conspirators.**

The acts and declarations of co-conspirators prior to the consummation of the completed act are all admissible in evidence both to show the conspiracy and the animus behind the act.

**2.—Same—Case Stated—Declaration of Co-Conspirator.**

Where, upon trial of assault to murder, the evidence showed that on the afternoon of the day of the assault the party injured, on the one side, and the defendant, his brothers, and others on the other side, had a fist fight; that the party injured knocked down one of the defendant's brothers, and that in the evening after this the defendant and his brothers collected at a place near the house where the party injured was; and defendant's companions in the previous fight went to said house and made some threats there against the party injured and finally brought him to the defendant and his brothers, shortly after which the assault occurred, there was no error in admitting all these matters.

**3.—Same—Evidence—Lying in Wait—Conspiracy.**

Upon trial of assault to murder, there was no error in admitting testimony as to tracks surrounding the scene of the assault, which tended to show that defendant and his brothers were lying in wait for the deceased.

**4.—Same—Evidence—Contradicting Witness.**

Where, upon trial of assault to murder, the State was permitted to introduce defendant's applications for continuance, and there was nothing in said applications which would contradict any statement made by defendant while testifying in his own behalf, the same were inadmissible in evidence.

**5.—Same—Aggravated Assault—Charge of Court—Insult to Female Relative.**

Where, upon trial of assault to murder, there was evidence that defendant's actions in meeting the party injured was based upon insulting conduct to his stepdaughter, and that this was the first meeting of the parties, the court's failure to charge on aggravated assault was reversible error.

**6.—Same—Self-Defense—Charge of Court.**

Where, upon trial of assault to murder, the State claimed a waylaying by the defendant, but the defendant denied this and claimed self-defense, which was supported by his evidence, the court's failure to charge on self-defense was reversible error, notwithstanding such claim of self-defense might probably not be true.

**7.—Same—Charge of Court—Principals—Conspiracy.**

Where, upon trial of assault to murder, the State's evidence showed a conspiracy between defendant and others to seriously injure the assaulted party, the court properly charged on the law of principals, but failed to submit the theory of the defense, which was aggravated assault and self-defense, and this was reversible error.

**8.—Same—Transcript—Practice on Appeal.**

See opinion showing that the transcript was unnecessarily voluminous. A record on appeal should present the real issues in the case.

Appeal from the District Court of Carson. Tried below before the Hon. F. P. Greever.

Appeal from a conviction of assault with intent to murder; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

*Willis & Willis,* for appellant.—On question of conspiracy: Guffee v. State, 8 Texas Crim. App., 187; Trimble v. State, 33 Texas Crim. Rep., 397; Ripley v. State, 51 id, 126; McAnnally v. State, 73 S. W. Rep., 404; Burrell v. State, 18 Texas, 713; Blain v. State, 30 Texas Crim. App., 702; Figaroa v. State, 58 Tex. Crim. Rep., 611, 127 S. W. Rep., 193; Bryan v. State, 49 Texas Crim. Rep., 200; Jackson v. State, 20 Texas Crim. App., 190; Green v. State, 49 Texas Crim. Rep., 238; Cooper v. State, 48 id, 608; Sharp v. State, 29 Texas Crim. App., 211; Choice v. State, 52 Texas Crim. Rep., 285; Dungan v. State, 39 id, 115; Downing v. State, 61 id, 519; Yarbrough v. State, 66 Tex. Crim. Rep., 311, 151 S. W. Rep., 545; Schackey v. State, 41 Texas Crim. Rep., 255; Clifton v. State, 46 id, 18; Crook v. State, 27 Texas Crim. App., 198; Rhodes v. State, 39 Texas Crim. Rep., 332; Wright v. State, 43 Texas, 170; Bluman v. State, 33 Texas Crim. Rep., 43; Menges v. State, 25 Texas Crim. App., 710; Cortez v. State, 24 id, 511.

On question of admitting evidence of tracks: Liles v. State, 58 Tex. Crim. Rep., 310, 125 S. W. Rep., 921.

On question of admitting applications for continuance: Lauders v. State, 63 S. W. Rep., 557; Askew v. State, 59 Tex. Crim. Rep., 152, 127 S. W. Rep., 1037; Clifton v. State, 46 Texas Crim. Rep., 18.

On question of court's failure to charge on aggravated assault:

Moore v. State, 33 Texas Crim. Rep., 306; Stevens v. State, 38 id, 550; Chatman v. State, 40 id, 272.

On question of court's failure to submit self-defense: Monson v. State, 63 S. W. Rep., 647; Voight v. State, 53 Texas Crim. Rep., 268; Parnell v. State, 50 id, 419; Thomas v. State, 48 id. 67; Palmer v. State, 47 id, 268; Chapman v. State, 45 id, 479.

*C. E. Lane,* Assistant Attorney-General, for the State.

HARPER, JUDGE.—Appellant was convicted of assault to murder and his punishment assessed at five years confinement in the State penitentiary.

It appears that on the afternoon of the day that the shooting occurred at night, Jeff Wilson, Joe Allen and Dorsey Jones met at a point near the residence of Mr. Losey. That a fight between Jeff Wilson and Dorsey Jones occurred, in which Dorsey knocked Jeff Wilson down. Jones left and went to the home of Mr. Crites where he was working. It appears that after this fight, Jeff Wilson, Bob Wilson, Joe Allen and appellant were all seen at the home of L. A. Allen, the father of Joe Allen, and they all left there about the same time. Between the time of the fight in the afternoon, and the shooting at night, Joe Allen went to the home of C. B. Warner and asked him if Dorsey Jones was there, and upon being told that he had gone, Joe Allen remarked, "We are going to get him." While at the home of L. A. Allen, Bob Wilson asked how long Dorsey Jones had been gone, and when told, said, "We are going to get him." Mr. Allen then talked to him about the fight between Dorsey Jones and Jeff Wilson and advised him to drop it, when Bob Wilson replied, "Well, it ain't settled, Mr. Allen." They left this place going in the direction of Mr. Crites,' the three Wilsons being in a buggy and Joe Allen horseback. It appears that Joe Allen went to the residence of Mr. Crites alone, and called Dorsey Jones and asked him for some money that was owing him. Jones did not have the money, and Allen suggested that he could probably get it from a certain man and he needed it. Jones agreed to go and see, and in going to the place where the horses were situate, he came up on the three Wilsons in the buggy, in a little valley, when the difficulty occurred.

In a number of bills of exceptions objections were made to the statements of Joe Allen made to Mr. Warner, the statements made by Bob Wilson to Mr. Allen, and the evidence about the fight between Jeff Wilson and Dorsey Jones that afternoon, and the acts and conduct of Joe Allen at the residence of Mr. Crites. As the State's theory of the case is that all three of the Wilsons and Joe Allen were acting together in a conspiracy to take the life of Jones because of the difficulty between him and Jeff Wilson that afternoon, there was no error in admitting all this testimony. The acts and declarations of co-conspirators prior to the consummation of the completed act are

all admissible in evidence both to show the conspiracy, and the animus behind the acts. As to the fight that afternoon, as, according to the State's contention, the subsequent assault took place as an act of revenge for Jones knocking down Jeff Wilson that afternoon, it became admissible for the jury to determine whether or not the latter assault grew out of it, and the parties were attempting to kill Jones because thereof.

The testimony of Sam Hunter as to the condition of the ground where the assault occurred, the tracks, etc., found there, was properly admissible in evidence. The record shows that appellant was in the buggy at this point, and this testimony would have a tendency to show whether or not they were at this point waiting for Jones while Allen went to Mr. Crities' home after Jones. However, we cannot understand upon what theory the court admitted the two applications for a continuance made by appellant. It is true he took the stand and admitted that at the former term he had applied for a continuance on account of the absence of Allen, and stated that he expected to prove by him that Dorsey had made insulting remarks about his stepdaughter, and that he could prove this by no other witness, while at this term of court he applied for a continuance on account of the absence of his stepdaughter, alleging that she would testify that Jones had insulted her by making to her improper proposals. Appellant, while testifying, had explained this and said at the time the former term of court was held, his stepdaughter had not told him about the insulting proposals made to her, but had told him since he filed the first application for continuance. These applications would not contradict that statement, nor any statement made by appellant while testifying in his own behalf, and the court erred in admitting them in evidence. If when he testified on this trial that his stepdaughter had told him of improper proposals being made to her, and he was asked if at the former term of court he had not sworn that he could prove these facts by Joe Allen alone, he had denied doing so, so much of the application as showed he had so sworn would have been admissible. But when the question was propounded to him he admitted he had so sworn and stated that his stepdaughter had told him since that time and the application for a continuance, or any portion thereof would not tend to impeach his testimony on this trial. And the same may be said of the application made at the term of court at which he was tried. Nothing therein contained would tend to impeach his testimony on the trial and we are at a loss to understand why the applications were admitted in evidence.

The court failed to charge on aggravated assault, and in this we think the court erred. It is true the evidence offered in behalf of the State would make a case of assault to murder, but appellant testified that he was informed that Jones had made very insulting remarks about his stepdaughter, by both his brother, Jeff, and by Joe Allen; that after hearing of these remarks he went to see Jones about the

matter with a view of demanding an explanation from him. If ap-pellant was informed that Jones had used insulting language about his stepdaughter, and imputed to her a want of chastity, and this produced in him anger, rage or resentment to the extent of rendering him incapable of cool reflection, and he, or those acting with him, had killed Jones within an hour after appellant had been so informed, at the first meeting, the issue of manslaughter would have been raised as to appellant, it being his stepdaughter that the want of chastity was alleged to have been imputed to. And if this is true, then as the assault did not produce death, the same circumstances, if true, would reduce the offense to an aggravated assault. Appellant's testimony raised this issue, and the court under appropriate instructions should have submitted it to the jury.

Again, appellant complains that the court did not submit the issue of self-defense. As hereinbefore stated the evidence offered in behalf of the State, made the offense assault to murder, without excuse or justification,—a case of way-laying. But appellant testified he did not send Joe Allen to the house after Jones; that he did not know he was going to that house, and while driving towards Crites' to see Jones about the insulting language he had used in regard to his stepdaughter, he met him in the road and asked him what he meant by the language he had used about his stepdaughter, when Jones denied using the language, and asked him who had told him (ap-pellant) that he (Jones) had done so. Upon appellant replying that Joe Allen and Jeff Wilson had so informed him that evening, Jones replied that it was a "God-damn lie," ran his hands in his pocket, and acted as if he was going to spring at him, when he, appellant, stopped him (Jones) and some one fired the shot that inflicted the wound. The prosecuting witness says that appellant did not fire the shot, but that he held him while his brother shot him. The evidence, we think, called for an appropriate charge presenting this issue to the jury. It may be the court did not believe it, and we think the cir-cumstances would indicate that it is probably not true, yet appellant so testifies, and the jury should have been told if appellant had been informed of the insulting language, and whether true or false, if he believed it to be true, and he went to see Jones to demand an explanation of his conduct, and when he did ask for an explanation, Jones, by his acts and conduct, at that time led appellant to believe that his life was in danger, and he had not entered into a conspiracy to take the life of Jones, he would be guilty of no offense.

There were well defined theories in the case,—that offered by the State and that presented by defendant. The evidence offered by the State would support the theory that there was a conspiracy formed by appellant, Fred and Bob Wilson, and Joe Allen to take the life of Dorsey Jones because he had whipped Fred Wilson that evening, and in pursuance of that conspiracy they had gone to the home of Jones; three of them stopped in the valley, while the fourth went to

the house and got him, and caused him to go by this valley, when he was assaulted; consequently, the court did not err in charging on who are principals in the commission of an offense. Consequently, the court did not err in admitting all testimony going to prove those issues and submitting in his charge that theory to the jury. On the other hand, the defense of appellant was he entered into no conspiracy; that he did not shoot Jones and did not know anyone else was going to do so, when it was done; that when he approached Jones and asked him about the language he says he had been informed Jones had used in regard to his stepdaughter, Jones ran his hand in his pocket and acted as if he was going to spring towards them, when the shot was fired. The defenses offered were not submitted to the jury, and they should have been, under appropriate instructions.

There are many other bills of exceptions in the record, appellant reserving seventeen bills of exception to the evidence, he asked thirty special instructions, and there are a number of grounds in the motion, complaining of the charge of the court, making a voluminous record, much larger than was necessary to present the real issues in the case. However, we have carefully examined the entire record, and each ground in the motion for new trial, but do not deem it necessary to discuss any of the others. The rulings on the questions already discussed will furnish a criterion by which the case should be tried, as we have discussed all the material points raised.

Reversed and remanded.

*Reversed and Remanded.*